30 C.C.P.A.(Patents)

## In re REYNOLDS.

### Patent Appeal No. 4731.

Court of Customs and Patent Appeals.
May 3, 1943.

Clair W. Fairbank, of New York City (Harry F. Riley, of Washington, D. C., of counsel), for appellant.

W. W. Cochran, of Washington, D. C. (E. L. Reynolds, of Washington, D. C., of counsel), for Commissioner of Patents.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges.

HATFIELD, Associate Judge.

This is an appeal from the decision of the Board of Appeals of the United States Patent Office affirming the decision of the Primary Examiner rejecting all of the claims, Nos. 1 to 10, inclusive, in appellant's application for a patent for an alleged invention relating to a method of manufacturing phenol by heating "monochlorbenzol" and a solution of aqueous sodium hydroxide under pressure at a high temperature.

Claims 1, 3, 4, 6, and 10 are illustrative of the appealed claims. They read:

"1. In the manufacture of phenol by heating monochlorbenzol with an aqueous sodium hydroxide solution under pressure at an elevated temperature in an extended tubular reaction zone, the steps which consist in preheating the mixed reaction ma-terials by exchange of heat with the hot products of the reaction, and independently controlling the temperature at separate successive points along the length of said reaction zone as the reaction proceeds to completion to, thereby maintain the temperature in the reaction zone substantially constant throughout the length thereof."

"3. In the manufacture of phenol by heating monochlorbenzol with an aqueous sodium hydroxide solution under pressure at an elevated temperature in an extended reaction zone, the steps which consist in preheating the mixed reaction material to a temperature of about 310° C. by exchange of heat with the hot products of the reaction, applying heat from an external source to raise the temperature of the reaction mixture in the first portion of the reaction zone to approximately 370° C., and withdrawing heat in regulated amounts from further successive portions of said reaction zone, and at such rates as to prevent the heat of reaction from raising the reaction mixture substantially above 380° C.

"4. The method of making phenol which comprises heating a mixture of monochlorbenzol and an aqueous caustic alkali to reaction temperature under pressure, and thereafter controllably removing the heat from the reacting mass at a rate substantially equal to the rate of production of the heat of reaction."

"6. The method of conducting a hydrolytic type of reaction in a fluid mixture, including therein a halogenated benzene hydrocarbon and an aqueous solution of a base, which comprises heating said mixture to reaction temperature under pressure, maintaining such material in motion under pressure progressively through an elongated reaction zone, and subjecting separate successive portions of said reaction zone to the actions of separated bodies of a temperature changing fluid medium and said separate bodies being at such temperatures as will maintain the temperature of the reacting mass between 370° C. and 400° C., at substantially all points along the length of said zone."

"10. The method of producing phenol from monochlorbenzol and caustic alkali, which includes delivering a heated mixture under pressure through an extended reaction zone having a series of successive sections in. which heat is generated by exothermic reaction, delivering separate currents of a temperature changing medi-

um into heat exchanging relationship with said separate sections, and separately controlling the temperature of said separate currents."

The reference is: Putnam, 1,921,373, August 8, 1933.

It appears from appellant's application that a mixture of "chlorbenzol" and "caustic alkali solution" is introduced into a mixer from which it is forced under pressure of about 4,500 pounds per square inch by a pump through a series of heat exchange devices. In the first heat exchange device, the mixture is preheated by outgoing reaction products. In the other heat exchangers, the mixture is heated by hot water under pressure. In addition to the heat exchangers, there are employed a plurality of coolers through which a portion of the water from the heat exchangers may be circulated for the proper control of the temperature in the reaction zone. It will thus be seen that appellant's method consists in preheating the mixture of "monochlorbenzol" and caustic alkali solution, as stated, for example, in quoted claim 1, "by exchange of heat with the hot products of the reaction," and controlling the temperature of the mixture at "separate successive points along the length of said reaction zone as the reaction proceeds to completion," the temperature of the mixture in the reaction zone being maintained substantially constant, that is, within approximately 10 degrees (from about 370° C. to about 380° C., as stated in quoted claim 3) or within 30 degrees (between 370° C. and 400° C., as stated in claim 6). It further appears from appellant's application that the reaction in the reaction zone is an exothermic reaction, that is, it generates heat; that if the increase of such heat is sufficiently great, it causes corrosion in the tubing forming the reaction zone, and damages the apparatus and the product as well; and that by maintaining a substantially uniform temperature throughout the reaction zone, the production of undesirable by-products is reduced to a minimum. Appellant's purpose, as he states, is to maintain the temperature "at the highest allowable point throughout the period of reaction to allow the highest possible rate of reaction," and not to permit the temperature to exceed a maximum of 400° C.

The patent to Putnam relates to a method of conducting chemical reactions in liquid media, and discloses a method of manufacturing phenol by heating monochloro-benzene (referred to in appellant's application as monochlorbenzol) with an aqueous sodium hydroxide solution under pressure at a high temperature. The patentee discloses a conventional mixer, a pump, a main heater, an auxiliary heating element, a reactor or "reaction coil," and a heat exchanger adapted to bring the incoming mixture and the outgoing reaction product into heat transfer relation whereby the heat in the reaction product is transferred to the incoming mixture. The patentee states that his auxiliary heating element should be used preferably for the purpose of bringing the temperature of the mixture "to a suitable reaction temperature after which the use thereof may be cut out, and reliance thereafter be rested entirely upon the [main] heater." The patentee's reaction product is discharged through the heat exchanger, hereinbefore referred to, thence to a cooler and into a receiver. For the purpose of conserving heat, that portion of the patentee's apparatus, consisting of the main heater, the heat exchanger, the auxiliary heater and the reactor, is encased in a heat insulating jacket. The object of the patentee was the same as that of appellant; that is, to prevent corrosion of the apparatus, to improve the reaction product, and to increase the output of such product per unit of equipment. The patentee does not disclose in the drawings of his apparatus any means, such as heat exchangers, *in his reactor or reaction zone* for reducing the temperature therein which, he states, might, by exothermic reaction, be increased as much as 50 degrees or more. The patentee states, however, that the temperature in the reaction zone should be maintained substantially constant, and that "Variations in temperature from the optimum cause variations in yield and character of products formed." The patentee also states that: " * * * In case the exothermic heat gain is in excess of the heat losses, control will be attained by regulating a heat loss from some suitable portion of the stream, i. e., *before, in,* or *after the* reaction zone. In case the exothermic heat gain is less than the heat losses, control will be attained by regulating a heat input to some suitable portion of the stream, mostly directly to the portion thereof just before entering the reaction zone, more safely and easily to that portion of the entering stream while at low temperature as before entering the exchange zone." (Italics ours.)

It is further stated in the patent that "Temperature control of the process is accordingly attained by setting up and regulating a heat exchange between the outside of the apparatus and some portion of the stream of the reaction mixture within the apparatus, whereby through addition of heat from without or abstraction of heat from within, the reaction temperature may be maintained within the desired range in opposition to the influence of varying operating conditions which tend to upset the thermal balance." In a modified form of his apparatus, the patentee discloses, in Fig. 2 of his drawings, a heat exchanger and a reactor combined. The patentee states that he tested the arrangement disclosed in Fig. 2, but that he prefers the arrangement disclosed in Fig. 1 of his drawings in which, he states, "by the provision of an *unheated* insulated reactor, time is given for the reaction, when once the mixture has attained reaction temperature, undisturbed by heat changes due to the *action of the exchanger.*" (Italics not quoted.)

It will be observed from what has been said that the patentee plainly suggests that if, as a result of exothermic reaction, the heat gain in the reaction zone is in excess of the heat loss therein, such variation in temperature may be controlled by "regulating a heat loss from some suitable portion of the stream * * * in * * * the reaction zone," and, in the event the exothermic heat gain is less than the heat loss, control can be obtained by "regulating a heat input to some suitable portion of the stream" outside of the reaction zone, as in Fig. 1, or within the reaction zone, as in Fig. 2.

There is no teaching in the reference patent, however, of "controlling the temperature at *separate successive points along the length of*" the reaction zone, as called for by the appealed claims. (Italics ours.)

In its decision affirming the decision of the Primary Examiner, the Board of Appeals stated, among other things, that, although there was no definite teaching in the reference patent of controlling the temperature at more than one point in the reaction zone, "this is nothing more than an obvious refinement of the patentee's teachings in case the results attainable thereby will warrant the additional expense. In other words, in our opinion, the claims on appeal involve no new principle of operation or no new discovery, but merely a carrying forward of the rather definite teachings of the Putnam patent."

Counsel for appellant contend, contrary, we think, to the plain teachings of the Putnam patent, that the patentee does not disclose the idea of controlling in the reaction zone the heat generated therein by exothermic reaction. It is further contended by counsel that the patentee permits the temperature in the reaction zone to range from 350° C., which, it is argued, is below the proper reaction temperature, to over 400° C., which, it is stated, is above the proper reaction temperature, and that, therefore, the objects of the Putnam invention—the prevention of corrosion in the reaction zone, resulting in damage to the apparatus and the production of undesirable by-products in the reaction—were not attained.

It is stated in the Putnam patent that the range of temperatures of the mixture "may desirably be pushed to 350° to 400° C., or even somewhat higher, in the reaction zone, depending upon the character of reaction products desired"; that the degree of heat of reaction depends upon the percentage of caustic soda solution used; that in employing a 12% solution, some degree of exothermic reaction occurs; and that with a higher percentage of the solution, such as from 18 to 24%, a rise in temperature of 50 degrees or more might be realized. Claim 6 of the patent, however, calls for maintaining the temperature of the mixture in the reaction zone "above about 350° C. by the heat of reaction evolved," and "preventing the temperature in said zone from rising materially above 400° C. by controlled heat loss from a portion of the reaction system."

It would seem quite clear from appellant's application that his apparatus is more efficient for maintaining a proper temperature of the mixture in the reaction zone than is the apparatus disclosed in the drawings of the Putnam patent. However, the patentee states that variations in temperature from the optimum or most favorable temperature in the reaction zone would cause variations in the yield and character of the reaction product, and that the temperature should be maintained in the reaction zone from *"above about 350° C."* to "not materially above 400° C.," and plainly suggests to those skilled in the art that such temperature might be maintained by the addition of heat to, or the abstraction of heat from, the mix-

ture in the reaction zone by the use of heat exchangers. (Italics ours.)

It is argued by counsel for appellant that by appellant's method, the mixture is heated to a temperature of 370° C., at which temperature the reaction begins at an efficient rate; that the reaction product is withdrawn from the reaction zone at a temperature of 380° C.; and that the temperature is kept within those limits at all points throughout the reaction zone.

It will be observed that, although claim 3 calls for the degrees of temperature specified by counsel, it is stated in appealed claim 6 that the temperatures maintained in the reaction zone are between 370° and 400° C. Furthermore, it is stated in appellant's application that appellant has found that, although a temperature of 380° C. is preferable, 400° C. is the maximum temperature for the proper carrying out of appellant's reaction process. It is evident, therefore, that maintaining the mixture in the reaction zone at a temperature between 370° and 380° C. is not critical. Moreover, there is no teaching in appellant's application that the reaction begins at an efficient rate *only* when the temperature of the mixture is at 370° C.

We have given careful consideration to the views presented here by counsel for appellant but are unable to hold that the Board of Appeals erred in concluding that the method of "controlling the temperature at separate successive points along the length" of the reaction zone, as called for by the appealed claims, is anything more "than an obvious refinement of the patentee's teachings." Accordingly, the decision of the board is affirmed.

Affirmed.